Brockenbrough, J.
The case of Eib against Martin is to be first considered. And, in that case, the first question is, Whether Martin, upon his own shewing in his bill, ever had a right to make Eib a party defendant to it? Whether Maulsby’s obligation of the 8th .March 1805 (on which Martin’s claim is founded) to pay Weaver 120 dollars, out of Eib’s bond to Hickman (then held by Maulsby) dated the 24th January 1805, and payable the 1st April 1807, so soon as the money could be got from Eib,—can be regarded as an equitable transferor assignmentfiomMaulsby to Weaver, of Eib’s bond, or any part thereof? If it was not such an assignment, then Eib was never responsible to Weaver, or his immediate and remote assignees Lewis and Jesse Martin. This point was discussed in Clayton v. Fawcett’s adm’rs, 2 Leigh 19. In that case, there was an actual order drawn by Fawcett on Baker, who held the bond of Carlisle due to Fawcett, in which he requested Baker, as soon as he should collect the money due from Carlisle, to pay it to Clayton, as he owed him about 200 dollars of the money; but there was a restriction in the order, namely, that it was to be paid to Clayton, “ if I (Fawcett]) should not happen with you.” That order was held *139 not to be an equitable assignment by Fawcett to Clayton, of any part of Carlisle's debt to him: the restriction limited the power of Clayton to receive the money, to the case of Fawcett's being absent, and the order was merely directory to Baker, and an indication to him, that Clayton was to supply the place of Fawcett, in case of his absence, and to receive the money, not for himself but for Fawcett, the drawer: and, therefore, it was held, that as Clayton held no lien on the money, it should be paid to Fawcett's administrators to be paid to his creditors in a due course of administration. Now, the letter or order in that case, approached much nearer to the character of an assignment, than the obligation of Maulsby in the present case. Here was no order of any kind drawn by Maulsby, either on Eib, the obligor in the bond of January 1805, or on Hickman to whom it was payable; nor did Eib ever agree to pay any part of the money to Weaver, the obligee in Maulsby's obligation, or to Lewis or Martin, the successive assignees thereof. The obligation of Maulsby was not a draft on any particular fund in the hands of any other person, but a personal obligation on himself to pay 120 dollars to Weaver or his assigns, as soon as he should receive his money from Eib. If Eib did not pay his debt at the time stipulated, or refused to pay, then Maulsby was probably bound to use due diligence to recover the money from Eib, and on his failure to use such diligence, or on his failure to receive the money, the obligation of Maulsby to his obligee Weaver became absolute, and the plaintiff Martin might sue Maulsby at law on his own obligation; or, on the principle of Winn v. Bowles, 6 Munf. 23. he might have sued Maulsby in equity, and made Weaver and Lewis parties defendants to his bill. But there was no privity between Eib and either Weaver, Lewis, or Martin; and consequently he was not bound either at law, or in equity, to pay them. He was only bound to his own obligee or his assigns. Eib, then, might have demurred to Martin's bill, if he had been a party; but in fact he was no party to it. When Martin commenced his suit, his process of subpoena named only Maulsby and *140 Lewis, and although his bill, which was filed more than a year afterwards, did indeed name Eib as a party; yet no process was ever served on him, nor did he ever appear in the suit, and the plaintiff actually dismissed his suit as to him, in 1825. He was directed to be made a party by the order of the chancellor of September 1826, giving the plaintiff leave to amend his bill by making him a party. This permission and order of the court was made, it is believed, in consequence of the development made by the copy of the record in Eib’s suit, brought in 1806, against Hickman and others, which had been referred to in Asher Leiois’s answer in this suit.
Eib, being thus made a party, promptly answered; and I am of opinion, that as he then appeared without process, he must be considered as having waived the irregularity of the former proceedings, so far as to make him a defendant, and to subject him to costs from the time he was so made a party, but no further. If it was proper to render a decree against Eib on the merits, yet it was not proper to have subjected him to the payment of the costs incurred during the eighteen years that the suit had been pending before he was a party.
Although Eib answered, the plaintiff Martin did not amend his bill; so that if he recover at all, he must stand on the original bill, and can only recover according to the allegations contained therein. He cannot recover on any new ground which did not exist at the time he filed his bill, or which was shewn by the defendant’s answer to exist, but of which he did not avail himself, by alleging, in his new or amended bill, the newly discovered matter, even although it might have been sufficient, if alleged and proved, to entitle him to a decree.
The new matter developed by the answer, consisted in the history of the transactions between Eib on the one part, and Hickman and Maulsby on the other, touching the contracts for the sale of Barkley’s place to Eib, and the rescission thereof, as alleged and proved in Eib’s suit against Hickman, Maulsby and others, brought in 1806, and deci *141 dec! in 1810. The decree in that, suit, instead of directing, • that the two bonds, which Eib had executed to Hickman, under the contract that was afterwards rescinded, and which Hickman had assigned to Maulsby, should be delivered up to be cancelled, adjudged, that Hickman should pay to Eib 570 dollars, the amount of the two bonds that had been assigned to Maulsby, with legal interest; which decree was rendered in September 1810, after Jesse Martin, the plaintiff in the present suit, had filed his bill. It is now insisted by the counsel for Martin, that as Eib obtained that decree in 1810, he either received from Hickman the amount of the two bonds held by Maulsby, or that he might have received it, and if he did not, it was his own laches; that, in either case, he was liable to pay to the holder of his two bonds the amount due on them; that he stood in the place of Maulsby, and was bound to pay over the 120 dollars due on the obligation executed by Maulsby to Weaver, on which this suit is brought; for that he had got hold of the fund out of which that money was to be paid, and having it, he ought to be considered as a trustee for Weaver or his assigns, and held liable to the appellee, Jesse Martin, for the amount. .All this may be true, and yet, in my opinion, the appellee ought, not to have recovered, unless he had alleged such a case, and brought forward such a claim, in his bill; which he has not done.
In the present case, it would be peculiarly improper to allow such a recovery to the appellee. If the appellant was to be condemned from his answer to allegations not made, he ought, at least to have had the benefit of the whole answer. The appellee ought not to have been allowed to fasten on the decree of 1810, exhibited in the answer, without giving any weight to the rest of the answer, in which the appellant swears, that he never knew of that decree, nor received any money under it; that Pindall, the counsel of Maulsby, one of his adversaries in that suit, claimed the benefit, of the decree either as counsel of Maulsby, or his assignee; that Pindall, in one of those characters, put Hickman in jail under the decree, forced the money from him, *142 and appropriated the proceeds of the decree to his own use. T- 7 . It the answer is to oe taken as true as to the fact of the decree being rendered, it must also be taken as true as to the appellant’s ignorance of its existence, and as to the decep^011’ ^aud, and crying injustice, perpetrated by Pindall. If the appellant had alleged in his bill, that Eib had obtained the decree against Hickman, and that he had thereby received the fund out of which his demand should be paid, or that he might have received it but for his own laches, Eib might have relied, in his answer, on the facts just mentioned; and so far as his answer was responsive to such charges in the bill, he would have thrown the burthen of proof on his adversary, and so far as it brought forward affirmative matter not responsive, he might have supported it by proof. He might have proved, that the decree was a collusive and fraudulent one in which he had no part; that he was ignorant of it, and that not he, but Maulsby, or his assignee or counsel, had received that fund. He might have shewn, that by the delay of the appellee for sixteen years, he, the appellant, had lost his remedy against Pindall, for that to any cross bill which he (Eib) might exhibit, Pindall might plead the statute of limitations, or rely on the staleness of the transaction to defeat the claim. But the allegations not having been made in the bill, the appellant could not be allowed to disprove them, however sufficient were his materials for that purpose.
I am of opinion, that the decree be reversed, and the bill dismissed.
Caer, J.
We are first to consider, whether Maulsby's obligation to Weaver, on which the appellee Martinis claim is founded, gave Weaver or his assignees, any personal claim upon Eib ? any right to sue him either at law or in equity? By that obligation, Maulsby acknowledged himself indebted to Weaver 120 dollars, and promised that he would pay him that debt, out of Eib’s bond to Hickman, which he held by assignment from Hickman, as soon as the money might be got from Eib. Got by whom? by Maulsby, assuredly: he *143 retained the bond, with the legal title; and he promised, that he would pay the money, when he should get it of Eib. Is this a transfer of the bond or of the debt due from Eib, or of any part of it ? Nothing like it, but a mere designation by the debtor, of the fund out of which he meant to pay the debt; and, so far from intending to give to his creditor any draft or order on this fund, he expressly reserves to himself the whole control over it, as respected his own debtor, and, especially, the exclusive right of receiving it himself. The case of Clayton v. Fawcett's adm'r, in which the subject was much canvassed, and the authorities touching it examined, is decisive of the point. [Here, the judge stated the circumstances of that case, and the reasoning upon which it was decided; and shewed, that there was less reason in this case than in that, to hold that the debt was assigned]. I am of opinion, then, that Eib was in no form liable to the suit of Weaver or his assignee, and might safely have demurred to the bill.
But let us look at the merits. In 1805 Adam Hickman sold to Eib, a tract of land in Harrison, for which Eib gave his Pennsylvania land, and 800 dollars in three bonds. Eib reserved the privilege of cancelling the bargain, if when he examined the land, he should not like it. The land in Harrison was owned by Hickman and Maulsby in partnership, and two of the three bonds were transferred by Hickman to Maulsby, as his share of the purchase money. When Eib saw the land, he objected to taking it, and the bargain was cancelled. Hickman gave up the bond he retained, and promised to get those he had transferred to Maulsby; but he did not. Maulsby transferred one of these bonds to William Martin, who brought suit on it at law. And then Eib (in June 1806) filed a bill against Hickman, Maulsby and Martin, stating the facts, and praying that the two bonds might be cancelled. Hickman and Maulsby answered; proofs were taken; every allegation in the bill was supported ; and in September 1810, the cause was heard, and a final decree rendered, by which Eib had a decree against Hickman, for the amount of the two bonds, 570 dollars with interest, and the bill was dismissed *144 as to Maulsby and Martin. Strange as this decree seems upon the proofs in the record, it has never been appealed from, and must be taken as conclusive between the parties. A ca. sa. was sued out on the decree against Hickman, on which he was taken and - committed to jail. In October 1810, Hickman being still in execution on the decree, an arrangement was entered into by Jackson, the attorney for Eib, and Pindall, who, besides being attorney at law for Maulsby, was moreover interested, as assignee, in the bonds of Eib to Hickman; by which arrangement, Pindall agreed to take Eib’s decree against Hickman, in full satisfaction of Eib’s two bonds, and thus to clear Eib of all claim on that score, which would effect the only object for which Eib went into equity. Pindall, being thus possessed of Eib’s claim on Hickman, did, in October 1810, receive of Hickman full satisfaction of the decree, and released him from custody. I consider this a final settlement of the business, and that Eib could never after be called on for the bonds, or any part of them; for Pindall, whether he acted as attorney for Maulsby, or as owner, or in both characters, had certainly power to make the settlement, so far as to clear Eib; and if he exceeded his power as regarded Maulsby, he was liable to him alone. But it is in proof, that Pindall and Maulsby, have settled the account between them. Let it be remembered, that, during this whole time, the suit of Martin v. Maulsby, Eib and others was slumbering on the county court chancery docket: Eib no party to it, and never intended by Pindall, the plaintiff’s counsel, to be made a party; for he knew Eib was clear of the claim, and that this would come out so soon as he was brought into court. From the time Eib executed the bonds to Hickman, to the time he first had notice of this claim, was twenty-one years; long enough, of itself, to raise the presumption of payment of his bond.
I am then, upon every view of this case, of opinion that the decree should be reversed and the bill dismissed.
Brooke, J.
Waiving all objections as to the irregularity of the proceedings against Eib, and taking his answer, *145 voluntarily filed to Martin’s bill, as an admission that he had been regularly brought before the court,—I cannot comprehend, how Maulsby’s obligation to pay Weaver 120 dollars, out of the bond of Eib to Hickman then held by Maulsby, when the money should be got from Eib, can be regarded as an assignment of Eib’s bond, or of so much of the debt due thereon, to Weaver. The terms of that obligalion of Maulsby import no such transfer, even by implication. The instrument gave no right to Weaver, or his assignees, to demand payment from Eib; nor did it authorize Eib to pay the money to them: Maulsby himself was to pay the money to Weaver or his assigns, so soon as he should get it from Eib. The grounds on which equitable transfers of debts are sustained, are fully explained in Clayton v. Pawcetfs ad/m’r. Here, there was no transfer, in law or equity. If, indeed, the instrument executed by Maulsby to Weaver, had amounted to an equitable assignment pro tanto of Eib’s bond, there is no, proof that Eib had notice of such transfer, until he was made a party to this suit in 1826, long after Eib’s decree against Hickman, for the amount of his two bonds that had been assigned by Hickman to Maulsby, had been applied to the satisfaction of Maulsby’s claim upon those assigned bonds, by Pindall, the attorney of Maulsby, and, probably, the holder of all Maulsby’s rights. I think the evidence in the cause warrants the belief, that Maulsby’s interest in Eib’s bonds, was assigned by him to Pindall. It is certain, that Hickman paid the amount of Eib’s decree against him, to Pindall, and was thereupon released from custody under the execution sued out on that decree.
The court is of opinion, that the decree in the case of Eib v. Martin be reversed, and the bill dismissed.
As to the case of Pindall’s ex’x v. Eib, the foundation of this suit being wholly removed by the reversal of Martin’s decree against Eib, the decree in this case for Eib against Pindall’s executrix, is also to be reversed, and the hill dismissed.